UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NOBEL INSURANCE CO.,

                  Plaintiff,

    -v-

CITY OF NEW YORK,

                  Defendant.

Case No. 00-CV-1328 (KMK)

OPINION AND ORDER

APPEARANCES:

Robert S. Moskow II, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
*Counsel for Plaintiff*

Edwin Michael Levy, Esq.
Corporation Counsel of the City of New York
*Counsel for Defendant*


KENNETH M. KARAS, District Judge:

       This case arises from a payment bond ("Bond") issued by Plaintiff Nobel Insurance Co.

("Nobel"), as surety, on behalf of Zollo Construction Corporation ("Zollo"), as principal, and the

Defendant City of New York ("City") as obligee.  Nobel asserts a right of equitable subrogation,

and claims that the City is liable for breaching its duty as a "stakeholder" to the contract funds.

The City moves for summary judgment on three grounds: (1) the Bonds contain the surety's

express waiver of any and all notice of payments by the City; (2) the City's payments to Zollo

were permissible under New York law because, *inter alia*, New York Lien Law provides the

exclusive remedy, and Nobel had made no payments to any claimant and therefore was not yet

subrogated to Zollo's right to payment; and (3) the claim is barred by a six-month contractual

statute of limitations period.  Moreover, the City maintains that to the extent Noble is entitled to

any recovery, such recovery should be limited to the $86,743.31 related to the specifically

identified contract, and not the entire $492,229.77 that Nobel seeks in its Complaint.  For the

reasons outlined below, the motion for summary judgment is DENIED in part and GRANTED in

part.

## I.  Background

### A.  The Shore Boulevard Project and Nobel's Bond

The basic facts are uncontested.[1]  On November 30, 1995, Zollo executed and delivered

---

[1] The following facts are alleged by Nobel to be "contested."  None of these contested facts appear to create a genuine issue of material fact that would preclude summary judgment on the grounds advanced by the City.

Nobel contests the claim that "[s]ubsequent to the award of the Contract, responsibility for its administration was transferred from [the Department of Transportation] to the New York City Department of Design and Construction ("DDC")."  (Rule 56.1 Statement of Material and Uncontested Facts ("City's 56.1 Statement") ¶ 8 (citing Levy Decl. ¶ 15))  Nobel argues that "[a]side from Mr. Levy's statement, the City has not shown that the Contract was assigned for purposes of administration of the Contract."  (Nobel's Responses to the City's Statement of Material and Uncontested Fact ¶ 8 ("Nobel's 56.1 Resp."))  Moreover, Nobel argues that if the Contract was assigned, it did not have notice and did not waive the right to receive notice of assignment.  (*Id.* ¶ 8 )  To the extent that this allegedly disputed fact suggests that the letter to DOT did not constitute adequate notice of the claim, this argument is addressed below. Otherwise, this argument is not pertinent to the dispute.

Nobel contests the claim that the February 24, 1998 letter, notifying the City of Nobel's potential liability, "was not addressed to the attention of any particular person or department" (City's 56.1 Statement ¶ 11), noting that "the letter was addressed to the New York City Department of Transportation."  (Nobel's 56.1 Resp. ¶ 11)  A review of the letter and fax cover sheet indicate the communication was not addressed to a particular person, but rather generally to the "NYC Department of Transportation." (Notice of Mot. for Summ. J. Ex. G)  However, there is no indication as to why this distinction is material.

Nobel contests the City's statement that Nobel "faxed and mailed a letter, dated February 24, 1998, to DOT concerning the Contract."  (City's 56.1 Statement ¶ 10 (citing Levy Decl. Ex. G))  Rather, Nobel maintains that "[t]he letter from Nobel to the New York City Department of

an Agreement of Indemnity in favor of Nobel, as indemnitee.  (Nobel's Statement of Material and Uncontested Facts ("Nobel's 56.1 Statement") ¶¶ 1-2 (citing Moskow Decl. Ex. A))  On May 22, 1996, Nobel, as surety, issued the Bond on behalf of Zollo, as principal, in favor of the City, as obligee, for the Shore Boulevard Bulkhead Rehabilitation from Quentin Street to Langham Street, Borough of Brooklyn, New York, Pin. No. 84195BK543RW (HWK692) ("Shore Boulevard Project" or "Shore Boulevard Contract" or "Contract").  (Nobel's 56.1 Statement ¶ 3 (citing Guest Aff. ¶ 2; Moskow Decl. Ex. B))

On or about June 23, 1997, the New York City Department of Design and Construction ("DDC") terminated the Shore Boulevard Contract for convenience.[2]  (City's 56.1 Statement ¶ 9;

_____

Transportation not only addressed the Contract, but also put the City on notice that Nobel had received claims against the Bonds and requested that the City hold the remaining Contract Funds."  (Nobel's 56.1 Resp. ¶ 10 (citing Moscow Decl. Ex. C) (same document as Ex. G above))  Nobel's more inclusive characterization of the letter appears to be accurate, but does not represent a contested fact that is dispositive to the present motion.

Nobel contests the City's quotation of the February 24, 1998 letter (City's 56.1 Statement ¶ 12), noting that, in addition to the excerpted portion, the letter also states, "Should you have any questions with regard to this demand, please contact the undersigned as soon as possible. Your cooperation is appreciated."  (Nobel's 56.1 Resp. ¶ 12)  Again, this additional language, while accurate, is not dispositive.

Nobel contests the City's claim that "[o]n March 3, 1998, DDC paid to Zollo the then contractually due termination payment of $492,229.77 for work performed and materials supplied." (City's 56.1 Statement ¶ 13 (citing Compl. Ex. B ¶ 15))  Nobel maintains the "final contract payment was *vouchered*" by the City on that date.  (Nobel's 56.1 Resp. ¶ 13 (citing Moskow Decl. Ex. D (Deposition of E. Doleyres)) (emphasis added)  The cited deposition goes on to say that the "check was issued on March 4, 1998."  (Moskow Decl. Ex. D 56)  The precise date of the issuance of the check—whether it was March 3 or March 4—is not dispositive to the resolution of this motion.

[2] When the work was approximately 8% completed, an unanticipated condition of the existing bulkhead came to light, preventing the work from continuing as designed.  (Levy Decl. ¶ 17)

Nobel's 56.1 Resp. ¶ 9)  On February 24, 1998, Nobel faxed and mailed a letter to the

Department of Transportation (DOT) (from Scott J. Guest, Bond Claim Manager), providing, in

pertinent part:

> Dear Sir or Madam:
>
> Nobel Insurance Company is the payment and performance bond surety for Zollo
> Construction Corp. with regard to the above-referenced construction [Shore
> Boulevard Rehabilitation] project.  Claims for payment have been asserted against
> our payment bond by subcontractors and suppliers of Zollo Construction Corp.
> As a consequence of these circumstances and events, Nobel is being exposed to
> potential losses under its bonds furnished for this project.
>
> We are attempting to communicate with the appropriate representatives of Zollo
> Construction Corp. to investigate the facts concerning this matter.  As of this time,
> however, we hereby demand, on behalf of Nobel that no further funds be released
> under the above-referenced contract without written consent and direction of
> Nobel.  This request is being made on the basis of and to protect its interests under
> it [sic] bonds furnished for this project.  Please note that any failure or refusal to
> observe the foregoing demand may be prejudicial to the surety.
>
> Should you have any questions with regard to this demand, please contact the
> undersigned as soon as possible.  Your cooperation is appreciated.

(Levy Decl. Ex. G; City's 56.1 Statement ¶¶ 10-12; Nobel's 56.1 Resp. ¶ 12)

On or about March 3, 1998, DDC paid Zollo a termination payment of $492,229.77 for

work performed and materials supplied in the prosecution of the Contract.  (City's 56.1

Statement ¶ 13; Nobel's 56.1 Resp. ¶ 13)

On March 9, 1998, David Fenichel, Associate General Counsel for DOT, faxed a copy of

Nobel's February 24, 1998 letter to Neil Murphy, General Counsel of DDC.  (City's 56.1

Statement ¶ 14 (citing Levy Dec. Ex. H); Nobel's 56.1 Resp. ¶ 14)

The parties further agree that, during a period from 1998 to 2001 (with the earliest

payments appearing to be on June 25, 1998), Nobel made a number of payments in connection

with the Shore Boulevard Contract (City's 56.1 Statement ¶ 5; Nobel's 56.1 Resp. ¶ 5), and other

payments in connection with "another, unidentified, contract."  (City's 56.1 Statement ¶ 6;

Nobel's 56.1 Resp. ¶ 6)

On February 1, 1999, Nobel filed a Notice of Claim ("Notice") with the Comptroller of

the City of New York.  (City's 56.1 Statement ¶ 1 (citing Levy Decl. Ex. A); Nobel's 56.1 Resp.

¶ 1)  The Notice indicates that Nobel seeks an "amount of not less than $492,229.77 released by

the City of New York to Zollo after notification by Nobel, as surety, of claims for payment

against its bonds by subcontractors and suppliers of Zollo."  (City's 56.1 Statement ¶ 2; Nobel's

56.1 Resp. ¶ 2)

### B.  Procedural History

The Complaint in this case was filed on February 18, 2000.  On November 16, 2000, the

City moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim.  On July

23, 2001, Judge Berman denied the motion to dismiss ("Berman Order").  First, Judge Berman

rejected the City's claim that Nobel's actions should be dismissed because, under the language of

the Bonds, Nobel waived its right to object to payment by the City, concluding that "it seems

desirable to have discovery to determine whether Nobel has, in fact, waived its claim."  (*Id.* at 7)

In reaching this conclusion, Judge Berman explained that "[n]either the Complaint, the Bonds

attached to it, the Contract, or Nobel's February 24, 1998 letter makes clear whether the City's

payment to Zollo was, in fact, a 'premature payment.'"  (*Id.* at 6)   Moreover, Judge Berman

suggested that "[t]he following facts, as yet not established, might be helpful in determining the

nature of the payment: (1) whether the work involved in the construction Contract was fully

completed; and (2) other circumstances surrounding payment."  (*Id.*)  Judge Berman, however,

5

emphasized that "**[t]he Court in this Order is in no way ruling upon the ultimate merit(s) of the Plaintiff's claim.**" (*Id.* at 5 n.5)

Second, Judge Berman rejected the City's argument that Nobel's action should be dismissed because, under New York Lien Law, the City did not have an obligation to withhold moneys due the contractor Zollo for the benefit of the surety Nobel. Again, Judge Berman noted the motion was premature because of the need for discovery:

> . . . At least limited inquiry (discovery) would be helpful to determine whether there were outstanding claims on which to file a lien, i.e. whether Nobel had paid all claims. Discovery needs to be conducted on the issue, among others, of whether or not all claims of laborers, suppliers, and subcontractors were satisfied by Nobel.
>
> Similarly, the Court is presented with a factual dispute as to whether (i) all claims of trust beneficiaries have been paid and (ii) whether or not there was malicious intent by the City.

(*Id.* at 9)

Third, Judge Berman rejected the City's argument that Nobel's claim was time barred because it was commenced after (a) the six month contractual limitations period provided for in Article 53 of the Contract (incorporated by reference into the Bonds); and/or (b) the one year and ninety day statute of limitation for the commencement of action in tort against a municipality provided for in Section 50-I of the General Municipal Law. Judge Berman concluded that "on these facts, [the Court] cannot determine if Nobel's action would be time barred because, among other things, the Court does not know if the 'condition' of a final payment voucher was satisfied." (*Id.* at 11)

Following denial of the motion to dismiss, the City appears to have served an answer on or about August 20, 2001 ("Answer"), although the Answer has not been docketed. (City's 56.1

Statement ¶ 4 (citing Ex. D))[3]  The parties subsequently conducted discovery.  After the completion of discovery, the City filed the instant motion for summary judgment.

II. Discussion

A.  Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary judgment is appropriate when after viewing all the facts in the record in a light most favorable to the non-moving party, there is no genuine issue of material fact present, so that 'the moving party is entitled to judgment as a matter of law.'"  *Forsyth v. Fed'n Employment & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "Such relief for the moving party may be appropriate after discovery if the non-moving party cannot prove an 'essential element of her case,' that is, one for which she bears the burden of proof."  *Forsyth*, 409 F.3d at 569 (citing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004)).

The burden is on the movant to show that there is no genuine factual dispute.  *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  "In deciding a motion for summary judgment, all ambiguities must be resolved and all reasonable inferences drawn in favor of the party opposing the motion."  *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61 (2d Cir. 2000) (citing *Anderson*, 477 U.S. at 255); *see also Giannullo*, 322 F.3d at 140.  "If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact

---

[3]  The City erroneously refers to Exhibit C.  The parties are urged to expeditiously file the Answer in order to complete the record.

finder could return a verdict for that party, then a genuine issue of material fact exists, and summary judgment is not warranted." *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003) (citing *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 286-87 (2d Cir. 2003)).

In this case, the central facts are agreed upon by the parties and the motion presents almost exclusively *legal* questions. "Summary judgment is appropriate where the factual predicates of each legal question are undisputed." *Grumman Allied Indus. v. Rohr Indus.*, 748 F.2d 729, 739 (2d Cir. 1984); *see also Vera v. Saks & Co.*, 424 F. Supp. 2d 694, 702 (S.D.N.Y. 2006) ("As . . . there are no disputed material issues of fact, the matter is ripe for summary judgment.").

## B.  Law of the Case

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)); *see also* 1B James W. Moore, Jo D. Lucas & Thomas S. Currier, Moore's Federal Practice ¶ 0.404[1], at 117 (1991), *quoted in DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992) ("Under the doctrine of law of the case, a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation."). "'The purpose of [the law of the case] doctrine is to promote the judicial system's interest in finality and in efficient administration.'" *Lillbask ex rel. Mauclaire v. Sergi*, 193 F. Supp. 2d 503, 511 (D. Conn. 2002) (quoting *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1982) (internal quotation marks omitted)).

The law of the case doctrine, however, does not preclude this Court from reconsidering issues on summary judgment that have initially been raised in the context of a motion to dismiss. *See Day Springs Enters. v. LMC Int'l, Inc.*, No. 98-CV-0658A(F), 2004 WL 2191568, at *13 (W.D.N.Y. Sept. 24, 2004) ("Although the arguing of a motion for summary judgment on the same legal issue which has already been denied on a motion to dismiss for failure to state a claim potentially may be barred under the 'law of the case' doctrine, 'where a party has argued an issue during one motion before a given judge, the doctrine does not necessarily preclude a different judge from considering the same argument proffered during a subsequent motion [for summary judgment].'" (quoting *Dawes v. Leonardo*, 885 F. Supp. 375, 376-77 (N.D.N.Y. 1995))). "Rather, that a complaint has been found, on a motion to dismiss, to state a claim on its face does not guarantee that resolution of such claim will require a trial.  Significantly, as a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case, such ruling will not preclude a subsequent ruling in favor of a defendant on the same issue on a motion for summary judgment following discovery."  *Id*; *accord McKenzie v. Bellsouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) ("[O]ur holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery."); *Golden Pac. Bancorp. v. FDIC*, 95 Civ. 9281, 2003 WL 21496842, at *5 n.14 (S.D.N.Y. June 27, 2003) (noting that prior denial of motion to dismiss did not foreclose consideration of later summary judgment motion).  As outlined above, many of Judge Berman's conclusions were based on his view that resolution of the issues presented in the motion to dismiss was premature before the completion of discovery.  Thus, a reevaluation of many of these issues in the context of summary judgment is appropriate.  To the extent, however, that

Judge Berman made legal conclusions which are not in any way altered by discovery, or by

subsequent developments in the law, this Court will not here reconsider those prior rulings.

    C.  Nobel's Theory of Recovery

        1.  Doctrine of Equitable Subrogation

    Before examining the specific grounds for summary judgment, the Court reviews Nobel's

theory of recovery.  Nobel primarily seeks relief under the doctrine of equitable subrogation.  The

Second Circuit has generally summarized the doctrine of equitable subrogation as follows:

> Subrogation is the right one party has against a third party following payment, in
> whole or in part, of a legal obligation that ought to have been met by the third
> party.  The doctrine of equitable subrogation allows insurers to "stand in the
> shoes" of their insured to seek indemnification by pursuing any claims that the
> insured may have had against third parties legally responsible for the loss.  In
> short, one party known as the subrogee is substituted for and succeeds to the rights
> of another party, known as the subrogor.  The doctrine of subrogation, which is
> based upon principles of equity, has a dual objective as stated by New York
> courts: It seeks, first, to prevent the insured from recovering twice for one harm,
> as it might if it could recover from both the insurer and from a third person who
> caused the harm, and second, to require the party who has caused the damage to
> reimburse the insurer for the payment the insurer has made.

*Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir. 1999) (internal citations omitted); *see*

*also St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 84 (2d Cir.

2005) ("Subrogation is an 'equitable doctrine [that] allows an insurer to stand in the shoes of its

insured and seek indemnification from third parties whose wrongdoing has caused a loss for

which the insurer is bound to reimburse.'" (quoting *Kaf-Kaf, Inc. v. Rodless Decorations, Inc.*,

687 N.E.2d 1330, 1332 (N.Y. 1997))); *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37

(1962) ("[P]robably there are few doctrines better established than that a surety who pays the

debt of another is entitled to all the rights of the person he paid to enforce his right to be

reimbursed."); *Memphis & L.R.R. Co. v. Dow*, 120 U.S. 287, 302 (1887) (noting that the right to subrogation is a creature of equity, and is "enforced solely for the purpose of accomplishing the ends of substantial justice").  The determination of whether to apply equitable subrogation is committed to the discretion of the Court.  *See United States v. Baran*, 996 F.2d 25, 29 (2d Cir. 1993).

As applied to the particular circumstances of this case, Nobel, as the insurer/subrogee/ surety, seeks to stand in the shoes of Zollo, as the insured/subrogor/principal, and recover from the City as obligee/stakeholder.  In other words, Nobel argues that it is entitled to recover the losses it sustained when it paid Zollo's subcontractors pursuant to its obligations as a surety. Nobel further argues that the City became a stakeholder for remaining contract proceeds when Nobel notified the City in its February 24, 1998 letter that its interests were in jeopardy, and that the City failed to fulfill its obligations as a stakeholder.  In other words, even before Nobel paid any of the subcontractor's claims, and therefore before its subrogation rights were triggered, Nobel contends that by virtue of its notice to the City of the claims by unpaid subcontractors, the City was bound by equitable subrogation principles to act as a stakeholder of the payments allegedly due to the contractor.

In support of this theory of recovery, Nobel cites to a number of cases for the proposition that "the government becomes a 'stakeholder' for remaining contract proceeds when a payment and performance bond surety notifies the government that the surety's interest is in jeopardy because of default by the contract or . . . based upon the reasoning that once the surety notified the government of the contractor's default, the surety could assert the equitable doctrine of subrogation." *Ransom v. United States*, 900 F.2d 242, 245 (Fed. Cir. 1990) (citing *Balboa Ins.*

*Co. v. United States*, 775 F.2d 1158, 1160-63 (Fed. Cir. 1985)); *see also Newark Ins. Co. v. United States*, 169 F. Supp. 955, 957 (Ct. Cl. 1959) (denying defendant's motion for summary judgment on the grounds that if government officials, after due notice of facts giving rise to equitable right in surety, paid out the money without a valid reasons for doing so, surety would be entitled to judgment against the United States). That is, "a surety has an equitable right of subrogation to contractor funds retained by the government when the surety pays debts of the contractor to subcontractors pursuant to a payment bond." *Int'l Fid. Ins. Co. v. United States*, 25 Cl. Ct. 469, 473 (1992) (citing *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141-42 (1962)).[4] "Equitable subrogation is one of a surety's principal mechanisms for reducing loss." *Pa. Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 951 (8th Cir. 2004) (citing *Prairie State Bank v. United States*, 164 U.S. 227, 231 (1896) (recognizing surety's subrogation rights as "elementary")).

It is true that these cases and many of the cases relied on by Nobel are from outside of the Second Circuit, with most being cases from the Court of Federal Claims and the Federal Circuit. In addition, even many of the cases cited by Nobel that are from within the Second Circuit involve claims against the *federal* government under *federal* law, and therefore do not directly speak to whether New York recognizes such a right. *See, e.g.*, *Hannover Ins. Co. v. United States*, 279 F. Supp. 851 (S.D.N.Y. 1967) (involving causes of action brought under *federal law*,

---

[4] For purposes of this case, this line of authority is not altered by the Supreme Court's holding in *Department of the Army v. Blue Fox, Inc.* that sovereign immunity bars creditors from enforcing liens on Government property. 525 U.S. 255, 257 (1999). Rather, *Blue Fox* may have implications for determining whether there has been a waiver of sovereign immunity for equitable subrogation claims against the federal government, but not the City. *See Ins. Co. of the West v. United States*, 243 F.3d 1367, 1372 (Fed. Cir. 2001).

specifically the Tucker Act, 28 U.S.C. § 1346(a)(2), and the Federal Torts Claims Act, 28 U.S.C. § 1346(b)).  These decisions, however, are consistent with the principals of equitable subrogation applicable to this case.

To begin, one circuit has relied on the decisions of the Court of Federal Claims in evaluating a city's obligation to a surety under state law.  In *City of Pine Bluff*, the Eighth Circuit held that the City of Pine Bluff must reimburse surety Penn National for the losses it suffered after the city released funds to a general contractor despite notice of the general contractor's default and a request from the surety to withhold funds.  354 F.3d at 954.  The *Pine Bluff* court relied on a number of decisions from the Federal Court of Claims and Federal Circuit, *see id.* at 952, and noted that "[a]lthough no Arkansas decision covers these precise facts, we believe that the Arkansas Supreme Court would steer a course consistent with federal decisions," *id.* at 952-53.[5]

In addition, a number of cases generally recognize a surety's ability to recover from public entities under New York law.  In *United Fidelity & Guarantee Co. v. Triborough Bridge Authority*, 74 N.E.2d 226 (N.Y. 1947), the primary issue was the priority of claims asserted by the IRS and the surety to money held by the Triborough Bridge Authority ("TBA") following

---

[5]  The Second Circuit has cited *City of Pine Bluff* with approval, albeit in the context of examining equitable subrogation under Connecticut law.  *See Elm Haven Const. Ltd. P'ship v. Neri Constr. LLC*, 376 F.3d 96, 101 (2d Cir. 2004) ("Under Connecticut law, the doctrine of equitable subrogation is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter.  Equitable subrogation benefits only those who have some obligation, however indirect, to pay the debt at issue.  For example, it applies to an insurer who pays its insured's medical bills before a suit against the party who caused the injury has been completed, or to a surety who pays its obligee and then sues its principal to vindicate the rights of that obligee." (citing *City of Pine Bluff*, 354 F.3d at 951) (internal citations and quotations omitted)).

default by the contractor.  The court concluded that the "surety's rights are prior to those of the intervener [United States, which intervened asserting a tax lien]."  74 N.E.2d at 227.  In so holding, the court noted that the surety "succeeded—under principles of subrogation—to all rights which defendant Authority might have against the contractor, including that of withholding money due the contractor and of applying it to the payment of unsatisfied claims for labor and materials furnished."  *Id.*  More recently, the New York Court of Appeals reaffirmed that it has "long held that a completing surety succeeds under equitable subrogation principles to all rights that the obligee/owner has against the contractor, including the right to use the unpaid contract balance to complete the project or satisfy outstanding claims for labor and materials furnished." *RLI Ins. Co. v. N. Y. State Dep't of Labor*, 766 N.E.2d 934, 940 (N.Y. 2002).

In addition, in *Titan Indem. Co. v. Triborough Bridge & Tunnel Authority*, 135 F.3d 831 (2d Cir. 1998), the Triborough Bridge and Tunnel Authority ("TBTA") held funds following the contractor's default on its obligations.  Five different creditors made a claim to the money, including the surety.  The surety sued seeking a determination of the parties' rights, and the TBTA filed an answer and interpleader claim admitting that it had the funds and seeking to deposit them with the court pending adjudication of the parties' claims.  The court went on to resolve the competing claims under New York Lien Law.  In discussing the competing claims, the Second Circuit explained:

> Generally in a public improvement contract, the contractor is required to find a surety that will secure the performance of his contract.  Upon default by the contractor, the surety, pursuant to a performance bond, completes the contract, at its own cost and expense.  It then becomes equitably subrogated to the rights of the contractor and certain of the rights of the owner in the unpaid balance of the contract price.  *See Tri-City Electric Co., Inc. v. People*, 96 A.D.2d 146, 149 (N.Y. App. Div. 1983); *Scarsdale National Bank & Trust Co. v. United States*

14

*Fidelity & Guaranty Co.*, 264 N.Y. 159 (1934).

*Id.* at 834.[6]  Thus, the Second Circuit has acknowledged the equitable right of subrogation, under New York law, in the context of surety's seeking recovery on public projects.

Thus, although these cases do not address the precise issue in this case—that is, a surety seeking recovery from a municipality where the municipality has *failed* to implead the funds at issue—New York courts have consistently recognized a surety's right of equitable subrogation in the context of public projects.   Moreover, numerous cases from outside this jurisdiction have squarely addressed the issue presented in this case and have recognized the right of a surety to recover from a government entity under the principle of equitable subrogation.   Thus, Nobel's theory of recovery is legally viable on this basis.

2.  Alternative Theories of Recovery

Although not explicitly framed as alternative grounds for recovery, Nobel's papers in opposition to the summary judgment motion at times suggest that it is seeking recovery based on theories apart from purely equitable subrogation.   Nobel points to contract provisions and New York statutes that it maintains directed the City to withhold contract funds after notice from a surety.   In particular, Nobel cites General Municipal Law Section 106-b, which governs payment for public works projects and provides, in pertinent part:

---

[6] The Court further explained that "[u]nder a performance bond, a completing surety becomes entitled to the money still owed by the owner to the defaulting contractor, but only after the claims of all 3-A trust fund beneficiaries are first satisfied.  *Tri-City Electric Co., Inc.*, 96 A.D.2d at 149.  It is perfectly clear that the rights of a surety in the trust proceeds do not trump those of the Article 3-A trust fund beneficiaries."  *Id.*  Note that "Article 3-A trust beneficiaries" refers to the trust fund law under section 70 of Article 3-A of the New York Lien Law, which is discussed below.  As elaborated below, however, there does not appear to be any allegation that there are outstanding claims by Article 3-A trust fund beneficiaries in this case.

> The public owner shall promptly pay, upon receipt of a requisition, for these items less an amount necessary to satisfy any claims, liens or judgments against the contractor which have not been suitably discharged.  Any claims, liens and judgments referred to in this section shall pertain to the project and shall be filed in accordance with the terms of the applicable contract and/or applicable laws.

General Municipal Law § 106-b(1); *see also NRS Constr. Corp. v. City of New York*, 521 N.Y.S.2d 240, 241 (Sup. Ct. 1987) (discussing General Municipal Law 106-b).[7]  Accordingly, in *City of New York v. Cross Bay Contracting Corp.*, 662 N.Y.S.2d 462 (App. Div. 1997), *rev'd on other grounds*, 709 N.E.2d 459 (N.Y. 1999), the Court recognized the city's right to withhold funds from a contractor and the surety's rights, having been subrogated to the city, to recover such funds: "Under General Municipal Law § 106-b(1), however, the City is required to withhold sufficient funds to satisfy all 'claims . . . against the contractor which have not been suitably discharged.'" *Id.* at 15 (quoting General Municipal Law § 106-b)).[8]  In *Cross Bay*, however, the city had already deposited the sums in the interpleader action—thus, the question was whose rights were superior and not the city's liability for failure to withhold the funds.  The court focused more on the fact that the City had a "right to withhold from [the contractor]," 662

---

[7]  Section 106-b "pertains only to contracts for the 'construction, reconstruction or alteration of a public works project.'" *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 969 (2d Cir. 1988).

"The legislative history of General Municipal Law Section 106-b reveals its clear intent to protect contractors from the undue burden of excessive retention percentages being placed on municipal contracts."  *Montco Constr. Co. v. Giambra*, 712 N.Y.S.2d 766, 768 (N.Y. Sup. Ct. 2000).

[8]  The Court of Appeals reversed an award of summary judgment in favor of the surety, concluding that the fact the surety had satisfied some suppliers' claims did not prevent a statutory trust from attaching to the withheld funds or otherwise give the surety priority.  The main issue in that appeal, however, is not relevant to the present dispute: "[t]he appeal . . . hinge[d] on whether any of the funds at issue constitute an Article 3-A trust fund."  709 N.E.2d. at 461.

N.Y.S.2d at 466, and not the question of the right of the surety where the municipality failed to withhold funds.

Moreover, Nobel points to no authority suggesting that General Municipal Law section 106-b(1) creates a right of action by a surety against the municipality.  In fact, New York courts have explicitly held that "General Municipal Law § 106-b . . . creates no private cause of action for a municipality's failure to retain, and no such cause of action may be implied."  *Murnane Assocs. v. Harrison Garage Parking Corp.*, 659 N.Y.S.2d 665, 883 (App. Div. 1997).  The *Murnane* court specifically pointed to the following language in section 106-b: "'Nothing provided herein shall create any obligation on the part of the public owner to pay or to see to the payment of any moneys to any subcontractor or materialman from any contractor nor shall anything provided herein serve to create any relationship in contract or otherwise, implied or expressed, between the subcontractor or materialman and the public owner.'"  *Id.* (quoting section 106-b(2)).  The *Murnane* court explained that this "language demonstrates that the Legislature, in requiring public owners and their contractors to retain a percentage of progress payments pending substantial completion of the project, did not intend to impose any liability upon public owners for their failure or the failure of their contractors to retain moneys pursuant to section 106-b."  *Id.*   Thus, while General Municipal Law entitles the City to withhold funds, it does not create a private right of action for the surety to recover from the City.[9]

---

[9]  The additional provisions cited by Nobel are not particularly helpful in resolution of this dispute.  First, Nobel points to the New York interpleader statute, N.Y. C.P.L.R. section 1006.  While this statute may permit the City to file an interpleader complaint, as the City chose to do in *Cross Bay*, nothing in the statute suggests the City can be held liable for failure to interplead.

Second, Nobel points to a variety of Contract provisions that authorized the City to hold

17

D.  City's Arguments In Support of Summary Judgment

_____The City advances three specific claims in support of its motion for summary judgment:

(1) the Bond contains the surety's express waiver of any and all notice of payments by the City;

(2) the City's payments to Zollo were permissible under New York law because, *inter alia*, New

York Lien Law provides the exclusive remedy, and Nobel made no payments to any claimant and

therefore was not yet subrogated to Zollo's right to payment; and (3) the claim is barred by the

six-month contractual statute of limitations period.  The Court addresses each of these arguments

in turn, keeping in mind those matters which are already law of the case pursuant to Judge

Berman's disposition of the Motion to Dismiss.

1.  Waiver

Plaintiff maintains that under the express, unambiguous terms of the Bond, the surety

Nobel has waived any claims premised on payment to the contractor Zollo.  Specifically, the City

points to the following language in the Bond:

> The Surety (Sureties) for value received, for itself and its successor and assigns,
> hereby stipulates and agrees that *the obligations of said Surety (Sureties) and its
> bond shall be in no way impaired or affected by* an extension of time,
> modification, commission, addition, or change in or to the said Contract or the
> Work to be performed thereunder *or by any payment thereunder before the time
> required therein*, or by any waiver of any provision thereof, or by any assignment
> subletting or other transfer thereof or of any Work to be performed or any moneys
> due or to become due thereunder; and said surety (Sureties) does hereby waive
> notice of any and all such extensions, modifications, omissions, additions,

_____

the termination for convenience payment in response to Nobel's notice letter.  These provisions
merely establish that, as Nobel argues, "the City was entitled 'by law and by contract' to
withhold and/or deduct the amount of the outstanding claims from Zollo."  (Memorandum of
Law in Support of Defendant City's Motion for Summary Judgment 16 ("Nobel Br.")).  The
City, however, never appears to dispute the point that it was permitted to withhold funds based
on outstanding claims.  Rather the question is whether under the circumstances of this case, the
City was *required* to do so.

18

> changes, payments, waivers, assignments, subcontracts and transfers, and hereby
> expressly stipulates and agrees that any and all things done and omitted to be done
> by and in relation to assignees, subcontractors, and other transferees shall have the
> same effect as to said Surety (Sureties) as though done or omitted to be done by or
> in relation to said Principal.

(Moskow Decl. Ex. B 2)  Relying on the italicized language, the City maintains that Nobel is

precluded from bringing any claim that its rights were "impaired or affected" by the termination

payment to Zollo.  (Mem. of Law in Supp. of Def. City's Mot. for Summ. J. 6 ("City's Br.")

(arguing "the bond contains an express and unambiguous provision that a premature payment or

other transfer of moneys to the contractor shall not affect the surety's obligation on the bond, the

surety had waived its claims arising out of such payment")).

### a.  Applicable Law and Standard for Interpreting Surety Agreements

Judge Berman previously concluded that New York substantive law governs

interpretation of the Contract and Bond.  (Berman Order 3-5)  Accordingly, the Court applies

New York law in assessing the City's waiver argument.

Courts "look to standard principles of contract interpretation to determine the rights and

obligations of a surety under a bond."  *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369

F.3d 34, 51 (2d Cir. 2004); *see also Int'l Fid. Ins. Co. v. County of Rockland*, 98 F. Supp. 2d 400,

405 (S.D.N.Y. 2000) ("New York courts have held that 'The interpretation of a contract of

suretyship is governed by the standards which govern the interpretation of contracts in general.'")

(quoting *General Phoenix Corp. v. Cabot*, 89 N.E.2d 238, 241 (N.Y. 1949)).  That is, in

construing contracts of sureties, courts should "'give effect to the intention of the parties [and]

[i]n ascertaining that intention, [courts] read the language used by the parties in light of the

circumstances surrounding the execution of the instrument.'"  *Int'l Fid. Ins. Co.*, 98 F. Supp. 2d

19

at 405 (quoting *People v. Backus*, 22 N.E. 759, 760 (N.Y. 1889)).

However, "as particular creatures of contract law, surety bonds have spawned their own specific rules of construction.  For example, courts call on the rule of *strictissimi juris*[10] to ensure that the surety's obligation will not be construed to cover a new contract."  *Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper*, No. 99 Civ. 2952, 2002 WL 31812710, at *9 (S.D.N.Y. Dec. 12, 2002); *see also Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 34 (2d Cir. 1999) (explaining that "guarantee agreements are construed *strictissimi juris* under New York law, and that 'the court must protect the surety against a liability which is not strictly within the terms of the [guarantee] contract'") (quoting *People v. Stuyvesant Ins. Co.*, 413 N.Y.S.2d 843, 847 (Sup. Ct. 1979)).

However, the rule of *strictissimi juris* does not mean a surety contract is subject to different rules of interpretation:

> When applying the *Backus* standard [of *strictissimi juris*] to a case governed by New York law that involves a compensated surety,
>
>> [t]he rule that the liability of a surety is strictissimi juris does not in any sense mean that a suretyship contract is subject to rules of interpretation different from those applicable to any other contract. It simply means that once the intention of the parties to a suretyship agreement has been ascertained, the courts will guard the right of the surety, and protect him [, her, or it] against a liability which is not strictly within the terms of his [, her, or its] contract.

---

[10] Black's Law Dictionary defines *strictissimi juris* as follows:

Of the strictest right or law; to be interpreted in the strictest manner.  The term was usu. applied to certain statutes, esp. those imposing penalties or restraining natural liberties.

Black's Law Dictionary 1462 (8th ed. 2004).

*Int'l Fid. Ins. Co.*, 98 F. Supp. 2d at 405 (quoting 63 N.Y. Jur. 2d, Guaranty & Suretyship § 117 (1987)) (alternations in original) (additional citations omitted); *see also Richardson v. County of Steuben*, 122 N.E. 449, 451 (N.Y. 1919) ("The rule that the liability of a surety is to be strictly construed is so often reiterated . . . .  It does not mean that in interpreting the undertaking of a surety we are to be governed by different fundamental rules than those which are applicable to the construction of another contract.").

Moreover, " [the rule of *strictissimi juris*] is not rigidly applied to compensated sureties." *Millgard Corp.*, 2002 WL 31812710, at *10; *see also Chapman v. Hoage*, 296 U.S. 526, 531 (1936) ("The rule that any modification of the principal obligation releases the surety is also abated in the case of a compensated surety or indemnitor, who is discharged only so far as his right is shown to be in fact prejudiced by action of the indemnitee.  One who engages in the business of insurance for compensation may properly be held more rigidly to his obligation to indemnify the insured than one whose suretyship is an undertaking uncompensated and casual.").

Rather, as the City points out, "in cases in which New York courts have suggested that *any* deviation from the general rules of interpretation should apply when interpreting surety bonds, they have counseled, at least in the case of compensated sureties, interpretation against the surety." *Int'l Fid. Ins. Co.*, 98 F. Supp. 2d at 405.  That is, "[u]nder New York law, it is well established that [a] compensated, corporate surety . . . is not a favorite of the law and its contract of suretyship will be construed in a manner most favorable to [the] claimant." *Braspetro Oil*, 369 F.3d at 74 (internal citations and quotations omitted).  Thus, to the extent the meaning of the bond is ambiguous, such ambiguity should be resolved against the surety Nobel. *See Timberline Elec. Supply Corp. v. Ins. Co. of N. Am.*, 421 N.Y.S.2d 987, 988 (App. Div. 1979) (explaining

that the contract of suretyship "will be construed in a manner most favorable to a claimant," but

that in this case "there is no ambiguity to resolve against the surety"), *aff'd mem.*, 417 N.E.2d

1248 (N.Y. 1980).[11]

At the same time, however, as noted above, generally "[i]n deciding a motion for

summary judgment, all ambiguities must be resolved and all reasonable inferences drawn in

favor of the party opposing the motion."  *EMI Catalogue P'ship*, 228 F.3d at 61 (citing

*Anderson*, 477 U.S. at 255); *see also Arledge v. Stratmar Sys., Inc.*, 948 F.2d 845, 850 (2d Cir.

1991) ("A contract should be interpreted in a way that ascribes meaning, if possible, to all of its

terms, and where it is susceptible to more than one reasonable interpretation, its construction is a

question of fact for trial, and summary judgment is inappropriate.  In ruling on a motion for

summary judgment, of course, the court is required to resolve all ambiguities and to draw all

reasonable inferences in favor of the nonmoving party." (internal citations omitted)).

Therefore, while courts generally construe ambiguities in surety bonds *against* a

compensated surety, it is unclear such a principle should apply where a party moves for summary

judgment against a surety.  The Court need not resolve this issue, however, because in this case

the bond's terms are not ambiguous; rather, the Court concludes that a plain reading of the

waiver provision does not support the City's argument.

### b.  Interpreting the Waiver Provisions

"A waiver is an intentional and voluntary relinquishment of a known right, and a waiver

---

[11] Most of these cases discuss the principles for interpreting surety contracts in the context
of analyzing the breadth of a sureties' *obligation* under the bond, rather than in the present
context where the surety seeks compensation by the obligee City.  There is no suggestion,
however, that different principles apply in the present context.

of contractual rights will not be inferred absent a clear intent to waive." *Aniero Concrete Co. v. N. Y. City Constr. Auth.*, Nos. 94 Civ. 9111, 95 Civ. 3506, 1998 WL 148324, at *10 (S.D.N.Y. Mar. 30, 1998) (citations omitted), *aff'd*, 404 F.3d 566 (2d Cir. 2005) (per curiam); *see also State of N.Y. v. AMRO Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991) ("In the insurance context, New York law defines waiver as a voluntary and intentional relinquishment of a known right. . . . An irrevocable waiver may be found where the words and acts of the insurer reasonably justify the conclusion that with full knowledge of all the facts it intended to abandon or not to insist upon the particular defense afterward relied upon." (internal quotations and citations omitted)).

"Under New York law, if a surety agrees in advance to waive objections to modifications, such an agreement is valid and enforceable." *Aetna Cas. & Surety Co. v. N. Y. Sch. Constr. Auth.*, 95 Civ. 9412, 1997 WL 272404, at *3  (S.D.N.Y. May 21, 1997); *see also Aniero Concrete*, 1998 WL 148324, at *13 ("However, in a case such as this, where a surety explicitly agrees in the bond that prepayments by the obligee will not discharge its liability, the surety cannot later be heard to complain that the obligee made a prepayment without relying in good faith on a certificate of progress.").

As outlined above, Judge Berman previously rejected the City's waiver argument in the context of a motion to dismiss.  Judge Berman reasoned that neither the Complaint nor attached documents made clear that the City's payment to Zollo was a "premature payment," and that facts regarding the nature of the payment—including (1) whether the work involved in the construction Contract was fully completed; and (2) other circumstances surrounding payment—might be helpful in assessing this argument.  (Berman Order 6)

Discovery having now been completed, there is no genuine issue of material fact as to

23

whether the City's payment to Zollo was a premature payment.  The City fails to point to any

discovery that has revealed or even suggested that this was a premature payment.  Rather, the

indisputable facts reveal that this was a final payment made on March 3, 1998, which was nine

months *after* the termination of the contract on June 23, 1997 (City's 56.1 Statement ¶¶ 9, 13;

Nobel's 56.1 Resp. ¶¶ 9, 13).

Moreover, the principal cases relied upon by the City—*Aniero Concrete* and *Aetna*

*Casualty*—are distinguishable from the present circumstances.[12]  In *Aetna*, the surety Aetna

sought, *inter alia*, a declaratory judgment that its obligations under the performance bond had

been discharged when a newly created entity assumed performance obligations.  The court

concluded that Aetna waived any objection to such a change under the language of the bond,

which provided, in pertinent part, that the bond "shall in no way be impaired . . . by any

assignment, subletting or other transfer thereof of any work to be performed."  1997 WL 272404,

at *3.  Similarly, in *Aniero*, the court rejected a discharge defense by the defendant surety on the

grounds that such a defense was waived in the performance bond.[13]  Thus, both *Aetna* and

---

[12] Judge Berman previously distinguished these cases both based on the procedural posture of those cases (*Aniero* and *Aetna* involved motions for summary judgment, and Judge Berman was adjudicating the waiver issue in the context of a motion to dismiss), and because the facts of those cases involved "premature payment because the construction projects were on-going and neither contract had been terminated."  (Berman Order 6)

[13] In that case, the language of the bond provided, in pertinent part:

The Surety, for value received . . . hereby stipulates and agrees that the obligation of said Surety and its bonds shall in no way be impaired or affected by any extension of time, modification, omission, addition, or change in or to the said contract or the work to be performed thereunder, or by any payment thereunder before the time required therein, or by any waiver . . . .

1998 WL 148324, at *13.

*Aniero* involved instances where the surety sought to be discharged from the contract, and the court concluded that it had waived the basis for seeking such a discharge.

In contrast, here Nobel does not seek to be discharged, but seeks to recover under a theory of equitable subrogation.  The question, therefore, is whether Nobel waived the right to such recovery.  Yet, the language relied upon by the City deals with the *obligations* of the surety, suggesting the provision relates to when the surety is discharged from performance *and not* when the surety waives its right to recover from the obligee under a theory of equitable subrogation.

Accordingly, the Court finds no merit to the City's motion for summary judgment on the ground that Nobel waived its right to recovery.

### 2.  Whether the Payments Were Permissible Under New York Law

The City's second argument in support of its motion for summary judgment is that the payments Nobel complains of were permissible under New York law.  In other words, the City rejects Nobel's argument that it was required to withhold funds for Nobel's benefit under the doctrine of equitable subrogation.  The City raises two principal arguments in support of this claim—(a) New York Lien law provides the exclusive remedy for resolving the claims, and the Lien Law did not obligate the City to act as a stakeholder, and (b) Nobel was not yet subrogated at the time of the payment to Zollo because the claims of the subcontractors arising out of the contract had not been fully paid.  Additionally, at oral argument, the City vaguely suggested that inadequate notice provides an independent ground for dismissal.  The Court addresses each of these arguments in turn.

### a.  New York Lien Law

The City maintains that New York law does "not cast a common law obligation on an

owner to withhold moneys due a contractor for the benefit of a surety [but rather] New York has instead adopted an express statutory scheme—the New York Lien Law—establishing under what circumstances an owner is to withhold contract moneys otherwise due and owing a contractor and further delineating what legal rights attach to project moneys."  (City's Br. 10)

"Article 3-A of the New York Lien Law provides for the creation of a statutory trust out of the funds received in connection with contracts for the improvement of real property in New York."  *Flintkote Co. v. United States*, 47 F.R.D. 322, 325 (S.D.N.Y. 1969), *aff'd*, 435 F.2d 556 (2d Cir. 1971).  That is, "[t]he Lien Law declares that funds received by a general contractor in performance of public improvement contracts, and the right to receive those funds, are held by the contractor in trust for the benefit of his subcontractors and suppliers."  *S & D Maint. Co.,* 844 F.2d at 969.[14]  "An article 3-A trust commences 'when any asset thereof comes into existence'

---

[14] Specifically, N.Y. Lien Law section 70 provides, in pertinent part:

1. The funds described in this section received by an owner for or in connection with an improvement of real property in this state, including a home improvement loan, or received by a contractor under or in connection with a contract for an improvement of real property, or home improvement, or a contract for a public improvement in this state, or received by a subcontractor under or in connection with a subcontract made with the contractor for such improvement of real property including a home improvement contract or public improvement or made with any subcontractor under any such contract, and any right of action for any such funds due or earned or to become due or earned, shall constitute assets of a trust for the purposes provided in section seventy-one of this chapter.

For the purposes of this section: (a) any right to receive payment at a future time shall be deemed a right of action therefor and an asset of the trust even though it is contingent upon performance or upon some other event, but the fact that the right is a trust asset does not enlarge the right or excuse any performance or condition upon which it depends; (b) "contract" and "subcontract" shall include any modification of the contract or subcontract to which reference is made; and (c) funds due or earned under a contract or subcontract shall include any funds payable to the contractor or subcontractor in addition to the contract price by

26

and continues until all trust claims have been paid or discharged, or all assets have been applied

for trust purposes." *RLI Ins. Co.*, 766 N.E.2d at 938 (citing Lien Law § 70(3); Postner and

Rubin, *New York Construction Law Manual* § 9.69, at 352-353); *see also U.S. Fid. & Guar. Co*

*v. Madison Fin. Corp*., No. 01 Civ. 3998, 2002 WL 31731020, at *1-2 (S.D.N.Y. Dec. 4, 2002).

"The means of enforcing such a trust are provided in section 77 of the Lien Law, which

authorizes the holder of any trust claim to bring a class action to enforce the trust." *Flintkote*

*Co.*, 47 F.R.D. at 325.[15]

---

reason of any transaction, event or circumstance in the making or in the performance of the contract or subcontract.

2. The funds received by an owner and the rights of action with respect thereto, for or in connection with each improvement, shall be a separate trust and the owner shall be the trustee thereof. The funds received by a contractor or subcontractor and the rights of action with respect thereto, under or in connection with each contract or subcontract, shall be a separate trust and the contractor or subcontractor shall be the trustee thereof.

3. Every such trust shall commence at the time when any asset thereof comes into existence, whether or not there shall be at that time any beneficiary of the trust. The trust of which the owner is trustee shall continue with respect to every asset of the trust until every trust claim arising at any time during the improvement has been paid or discharged, or until all such assets have been applied for the purposes of the trust. The trust of which a contractor or subcontractor is trustee shall continue with respect to every asset of the trust until every trust claim arising at any time prior to the completion of the contract or subcontract has been paid or discharged, or until all such assets have been applied for the purposes of the trust. Upon termination of the trust by payment or discharge of all the trust claims, the beneficial interest in any remaining assets shall vest in the owner, contractor or subcontractor, as the case may be.

Lien Law § 70.

[15]Specifically, section 77 provides, in part:

1.  A trust arising under this article may be enforced by the holder of any trust

While the City's argument is not altogether clear, the thrust of the argument appears to be that the Lien Law provides an exclusive remedy to sureties such as Nobel.  However, the City has provided no authority in support of this assertion.  On the contrary, there is authority that the Lien Law is not an exclusive remedy.  *See e.g., Alliancewall Corp. v. M.D. Bartholomew, Inc.*, No. 86-CV-1211, 1989 WL 16066, at *7 (N.D.N.Y. Feb. 21, 1989) ("The Court first notes that although Plaintiff may have had a cause of action against A-E under the Article 3A of the New York State Lien Law, the remedy is not exclusive.  The 'trust fund' remedy is does not [sic] prevent a creditor from pursuing his ordinary remedies."(internal citations omitted)).

Indeed, New York courts have recognized the non-exclusivity of the equitable remedy of subrogation and the statutory Lien Law remedy.  In *RLI v. New York Department of Labor*, the New York Court of Appeals explained:

> [The surety] has paid all outstanding claims of the trust beneficiaries pursuant to its obligation under the payment bond.  Under equitable subrogation principles, where a surety has fully satisfied its obligations under a payment bond and the owner has retained funds to be used in completion of the improvement, "the [owner] had a right to use the retained fund to pay laborers and materialmen; *** the laborers and materialmen had a right to be paid out of the fund; *** the contractor, had [it] completed [its] job and paid [its] laborers and materialmen, would have become entitled to the fund; and *** the surety, having paid the

---

> claim, including any person subrogated to the right of a beneficiary of the trust holding a trust claim, in a representative action brought for the benefit of all beneficiaries of the trust.  An action to enforce the trust may also be maintained by the trustee.  In any such action, except as otherwise provided in this article, the practice, pleadings, forms and procedure shall conform as nearly as may be to the practice, pleadings, forms and procedure in a class action as provided in article nine of the civil practice law and rules; provided, however, that in determining whether the prerequisites of a class action have been satisfied, the provisions of paragraph one of subdivision (a) of section nine hundred one of such law and rules may be waived at the discretion of the court.

Lien Law § 77(1).

laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it" (*Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141, 83 S.Ct. 232, 9 L.Ed.2d 190 [1962] ).

Thus, in *Caristo Constr. Corp. v. Diners Fin. Corp.*, 21 N.Y.2d, at 510, 515, 289 N.Y.S.2d 175, 236 N.E.2d 461, supra, we determined that a contractor/co-obligor who satisfied the claims of unpaid subcontractors and suppliers under a payment bond succeeded to the Lien Law article 3-A rights of those trust beneficiaries and, thus, could maintain an action to recover diverted trust funds. The general contractor, as subrogee, was treated as the sole claimant under article 3-A and was not required to sue as representative of the beneficiaries (see, id., at 515, 289 N.Y.S.2d 175, 236 N.E.2d 461). Since the claims of the article 3-A trust beneficiaries have priority over [the Department of Labor's] cross-withholding, [the surety], as subrogee, has a superior right to the funds currently held by the owner.

Further, this Court has long held that a completing surety succeeds under equitable subrogation principles to all rights that the obligee/owner has against the contractor, including the right to use the unpaid contract balance to complete the project or satisfy outstanding claims for labor and materials furnished (see, *Aetna Cas. & Sur. Co. v. United States*, 4 N.Y.2d 639, 644-645, 176 N.Y.S.2d 961, 152 N.E.2d 225 [1958]; *United States Fid. & Guar. Co. v. Triborough Bridge Auth.*, 297 N.Y. 31, 35-36, 74 N.E.2d 226 [1947]; *Scarsdale Natl. Bank & Trust Co. v. United States Fid. & Guar. Co.*, 264 N.Y. 159, 164, 190 N.E. 330 [1934]; see also, *Pearlman v. Reliance Ins. Co.*, supra, at 137, 83 S. Ct. 232, 9 L.Ed.2d 190). . . . Upon completion of its obligations under the bonds, [the surety] became subrogated to this right as well. Moreover, if the parties had alleged or demonstrated that the funds at issue were assets of an owner's trust (see, Lien Law § 70[5] ), [the surety] could assert the owner's right and obligation under section 71(1) to ensure that the funds were used for the purposes of the trust.

*RLI*, 766 N.E.2d at 940 (holding that surety's right to funds that were still in possession of school district was superior to claim filed by Department of Labor for underpayment of wages by contractor in connection with an unrelated public improvement project).

In other words, *RLI* recognized that a surety may succeed under principles of equitable subrogation to the rights of Article 3-A trust beneficiaries. Nothing in *RLI*, however, suggests that Lien Law is the *exclusive* remedy. On the contrary, the decision suggests that New York

courts recognize equitable subrogation as a distinct remedy that is not limited by, or dependent

upon, the Lien Law.  *Id.* at 265.  Or, as the Fourth Department has held: "[t]he remedy on the

payment bond is in the nature of a third party beneficiary remedy.  It is dependent neither on the

existence of a lien fund or a Lien Law trust fund for its utilization or enforcement."  *Tri-City*

*Elec. Co. v. People*, 468 N.Y.S.2d 283, 286 (App. Div. 1983), *aff'd* 473 N.E.2d 240 (N.Y. 1984);

*accord Nat'l Sur. Corp. v. Fishkill Nat'l Bank*, 306 N.Y.S.2d 122, 126 (Sup. Ct. 1969) ("[I]n

addition to its common law rights of exoneration and indemnification, the surety has been

authorized by Section 77 of the Lien Law . . . to turn toward an alleged diverter to seek recovery

for the diversion of moneys appropriated for the particular improvement, and is thus enabled to

prosecute a trust fund action as if it were itself one of the state beneficiaries.").

     Thus, no authority holds that the Lien Law provides an exclusive remedy such that by

failing to proceed under Lien Law Nobel is not entitled to recovery under principles of equitable

subrogation.  Therefore, the Court rejects the City's suggestion that New York Lien Law

supplants an equitable right to recover.[16]

---

[16] The City advances a number of other arguments in passing.  The Court does not find
any of these arguments compelling.

    First, the City argues that the Procurement Policy Board ("PPB") Rules, codified at
Article 9 of the Rules of the City of New York ("RCNY"), govern the procurement of goods,
services, and construction by all City agencies, and that these rules provide that it is the policy of
the City to efficiently and expeditiously process contract payments.  (Nobel Br. 12)  Nobel
counters that these very rules provide that "before making payments to a contractor such as Zollo
here, it is critical that all subcontractors have been paid."  (Nobel Br. 17)  Specifically, Nobel
points to PPB Section 6-07 Rule (e)(1)(ii): "An agency may not approve a request for a progress
payment unless the request includes: . . . (ii) Certification by the prime contractor, that (B)
Payments to subcontractors and suppliers have been made . . . ."  (Nobel Br. 17 (quoting Levy
Decl. Ex. J))

    These arguments are not dispositive to the present motion.  The fact that the City has a

30

b.  Whether Nobel Was Subrogated

The City argues that "because plaintiff made no payments under the bonds at issue prior

to the City's termination payment to Zollo on March 3, 1998, plaintiff was not surrogated to

Zollo's right to payment under the Contract and bonds and the Complaint must be dismissed."

policy of efficiently and expeditiously processing contract payment does not protect it from a claim of equitable subrogation where it is properly characterized as a stakeholder of the funds. The Court is also unpersuaded by Nobel's suggestion that the City was obligated by PPB Section 6-07 Rule (e)(1)(ii) to ensure that all subcontracts are paid before making payments to a contractor.  To begin, this provision would appear to be inapposite in that this case involves a final payment, rather than an interim or progress payment.  Moreover, there is no indication that the surety has a cause of action for failure to comply with these rules.

Second, the City argues that "this action should be dismissed . . . [because] a surety has no right to the money earned by the contractor prior to the owner's termination of the contract, until all claims of trust beneficiaries, including Lien Law Article 3-A trust beneficiaries, have been paid."  (City's Br. 16 (citing *Tri-City Elec.*)).  However, the City points to no outstanding claims of other trust beneficiaries that might preclude Nobel from recovering at this time.

Third, the City argues, although this argument is not particularly well developed, that "under New York law, where an owner makes payment to a contractor in advance of when required by their contract, even where he has knowledge of the contractor's indebtedness to others, absent malicious intent directed at such creditors, the owner will not be charged with liability on account of such payments."  (City's Br. 16)  The cited cases are not pertinent to the present dispute.  *See, e.g.*, *Abe Child Stone Corp. v. Apostle*, 246 N.Y.S.2d 446, 447 (Sup. Ct. 1964) ( "The basic rule as to an owner's liability for mechanics' lien is that, except in cases of fraud or collusion or evasion of the provisions of the Lien Law, an owner cannot be compelled to pay any greater sum for the completion of a building than by his contract he has agreed to pay."); *Maycumber v. Wolfe*, 171 N.Y.S.2d 44, 51 (N.Y. Sup. Ct. 1958) ("The mere fact that payments are made by the owner to the contractor in advance of the time required by the contract, or that he has knowledge of the indebtedness of the contractor to the lienors, is not of itself sufficient to charge the owner with liability on account of such payments, but in addition thereto it must be shown, in order to avoid the effect of a payment as against a lien, that the advance payments were made for the purpose of avoiding the provisions of the Lien Law, and the burden of so proving is upon the lienor."  (citing, e.g., *Rukeyser v. Fountain & Choate, Inc.*, 185 A.D. 263 (N.Y. App. Div. 1918); *Glens Falls Portland Cement Co. v. Schenectady County Coal Co.*, 163 A.D. 757 (N.Y. App. Div. 1914))).

(City Br. at 13)

New York courts have repeatedly recognized that subrogation rights accrue only upon the payment of outstanding claims. *See Cross Bay*, 662 N.Y.S.2d at 753 ("Because [the surety] had not paid all outstanding claims, any subrogation rights that may otherwise arise have not matured here."); *Fed. Ins. Co. v. Arthur Anderson & Co.*, 552 N.E.2d 870, 872 (N.Y. 1990) (explaining that subrogation rights "accrue upon payment of the loss"); *Am. Sur. Co. v. Palmer*, 147 N.E. 359, 360 (N.Y. 1925) ("It is not liability to pay, but an actual payment to the creditor which confers the right of subrogation."); Restatement (3d) of Suretyship & Guaranty § 27(1) ("Upon total satisfaction of the underlying obligation, the secondary obligor is subrogated to all rights of the obligee with respect to the underlying obligation . . . ."). In this case, there is no dispute that Nobel did not make any payments prior to notifying the City that unpaid subcontractors had made claims, thus jeopardizing Nobel's interests. (City's 56.1 Statement ¶ 5; Nobel's 56.1 Resp. ¶ 5) At the same time, however, it is clear that Nobel paid $86,743.31 to subcontractors in connection with the project before filing this action to enforce its equitable subrogation rights. The question, therefore, is whether notice alone, rather than payment, triggered the City's obligation to act as stakeholder. (City's 56.1 Statement ¶ 5; Nobel's 56.1 Resp. ¶ 5)

Nobel argues that "[a]n owner's role changes from that of a party with an interest in the project to a stakeholder the moment it receives notice that the surety's interest is in jeopardy." (Nobel Br. 5) In other words, Nobel maintains that the City became a stakeholder regardless of whether Nobel's equitable subrogation rights were ripe. In support of this claim, Nobel cites to a number of cases that support the proposition that in the context of claims against the Government under federal law, an owner becomes a stakeholder upon receipt of a surety's letter. *See Ins. Co.*

32

*of the West v. United States*, 55 Fed. Cl. 529, 539 (Fed. Cl. 2003) ("Consequently, it is clear that the Air Force properly may be characterized as a stakeholder as early as December 4, 1997 [when the surety confirmed the contractor's letter that it would be unable to complete the construction project and indicated that payments should be sent from the Air Force to surety's San Diego office]"); *Transamerica Premier Ins. Co. v. United States*, 32 Fed. Cl. 308, 313 (Fed. Cl. 1994) (noting that the stakeholder "obligation is triggered not only when the Government is informed of the contractor's actual default but also—and perhaps more typically—when the Government receives reasonable warning from the surety of a contractor's *threatened* default under the bond."(emphasis in original)); *Home Indem. Co. v. United States*, 376 F.2d 890, 893 (Ct. Cl. 1967) ("On April 7, 1964, when plaintiff demanded that the balance of contract funds be retained pending settlement of the unpaid claims of materialmen, the defendant had written notice that the contractor had defaulted on his payment bond by failing to pay materialmen's claims which exceeded the balance due on the contract.  At that point, the defendant should have known that the contractor no longer had any property rights in the contract fund."); *see also Ransom v. United States*, 900 F.2d 242, 245 (2d Cir. 1990) ("In *Balboa*, this court merely held that the government becomes a 'stakeholder' for remaining contract proceeds when a payment and performance bond surety notifies the government that the surety's interest is in jeopardy because of default by the contractor." (citing *Balboa*, 775 F.2d at 1160-63)).

It is true that these cases primarily involve federal law and the federal government. However, the same principles have been adopted in the context of sureties seeking recovery from cities.  In *City of Pine Bluff*, the Eighth Circuit adopted the position that notice, even in the absence of payment, is sufficient to trigger a right of equitable subrogation:

These principles, considered with the equitable rights of laborers and material suppliers (and therefore the subrogated surety) to payment from remaining funds, have led federal courts to recognize the obligee's duty as a "stakeholder" to ensure proper application of collateral (contract funds and retainages) upon appropriate notice of the general contractor's default.  Indeed, the entire doctrine of subrogation in suretyship is dependent upon the immediate investment of the creditor with the obligations of a trustee whenever any rights or interests of the debtor, applicable to the debt, are placed in his control.  If, after appropriate notice of default, the government chooses to pay funds to the general contractor that are *or become* equitably owed to the surety, the government is liable for the actual loss visited upon the surety.

*City of Pine Bluff*, 354 F.3d at 953 (internal citations and quotations omitted) (emphasis added).

In addition, there is no indication that New York adopts a contrary position.  While it is true that

a number of the New York cases involve circumstances were the surety commenced proceedings

to recover *only after* payment, *see, e.g.*, *RLI*, 766 N.E.2d at 936-37, nothing in these cases

suggests that such payment is required before notice to an obligee of claims filed with the surety.

Moreover, a contrary rule would arguably place sureties in an untenable position.  As

noted below, the parties appear to agree that the statute of limitations on the action begins to run

on the day of the payment of the termination fee.  If, however, payment to subcontractors was

required *prior* to notice to the obligee, a surety would either have to immediately pay

subcontractors without necessarily having the opportunity to investigate the propriety of the

subcontractors' claims, or risk expiration of the statute of limitations.

c.  Adequacy of Notice

In its motion papers, the City never argued dismissal is appropriate because it received

inadequate notice that Nobel's interests were at stake.  At oral argument, however, the City

suggested summary judgment is appropriate on the independent ground that notice in this case

was inadequate to trigger the right of equitable subrogation.  This argument, however, was never

34

really clearly articulated.[17]

"'Normally, [the Court] will not consider arguments raised for the first time in a reply brief, let alone [at or] after oral argument.'"  *United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) (quoting *Keefe v. Shalala*, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995)); *see also United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) ("[Defendant] did not raise the issue in his lengthy brief, however, but made the point for the first time at oral argument.  We decline to consider this belated argument."); *Permatex, Inc. v. Loctite Corp.*, No. 03 Civ. 943, 2003 WL 22683341, at *9 n.1 (S.D.N.Y. Nov. 14, 2003) ("[Defendant] made a separate argument regarding a proposed reading of the recital clauses for the first time at oral argument.  Because of its untimeliness, that argument will not be considered here.") (Report and Recommendation), *adopted by*, 2004 WL 1277972 (S.D.N.Y. June 10, 2004).  In this case, at best, the City's argument was advanced for the first time at oral argument, and, even at oral argument the City fails to take a firm position.  Accordingly, the Court declines to accept this argument as an independent ground for summary judgment.

---

[17] At oral argument, the City vacillated on whether this argument provides an independent ground for summary judgment.  Originally, the City indicated that this is not a basis for its motion for summary judgment (Tr. 4 ("THE COURT: But let me ask you this.  And maybe this is an unfair question and you can tell me if it is.  In the recitation of facts and, in particular what you have just said, are you trying to say that had the appropriate official received the notice from Nobel that the City would not have paid out the termination amount to Zollo?  Is that what you are trying to assert here?  Levy: No, your Honor.  I'm just asserting the facts as they are in actually in the light that is most favorable to plaintiff.  THE COURT: Okay.").  Later in the argument, however, the City suggests that it is basing its argument in part on defective notice. (Tr. 45 ("THE COURT: My point is, I'm just trying to understand your argument because it seems that there is a new facet to this, that the stakeholder obligation does not get triggered bracketing the other reasons you had given because of the defective notice and the defect is in two layers; one is it goes to the improper component of the City government, the letter does; and secondly, it doesn't even admit to or define the claim.  It only admits to the potential for a claim.  Levy: Yes, your Honor.")

Even if, however, the Court were to consider this argument as an independent ground for summary judgment, the City's position fails.  Essentially, the City's argument seems to be that the February 24, 1998 letter was sent to the wrong department—that is, DOT, and only forwarded to DDC, the department responsible for the Shore Boulevard Contract, *after* the termination payment had already been made to Zollo.  Perhaps part of the problem with the City definitively alleging that it received inadequate notice is that the City may be partially, or wholly, responsible for the allegedly misdirected fax.  Based on the record, there appears to be a genuine issue of material fact as to whether the contract was actually transferred from DOT to the DDC, and whether Nobel was on notice of such a transfer.  (City's 56.1 Statement ¶ 8 (citing Levy Decl. ¶ 15); Nobel's 56.1 Resp. ¶ 8)

The City provides two responses to Nobel's suggestion that it received inadequate notice of the transfer.  (*See, e.g.*, Nobel's 56.1 Resp. ¶ 8)  First, the City maintains this was not an administrative transfer of the contract because "DOT and DDC are merely administrative departments of the City [and] [t]hey have no separate existence from the City."  (Reply Memorandum of Law in Support of Defendant City's Motion for Summary Judgment 3 ("City's Reply Br."))  To the extent the City's position is that these are not separate departments, this undermines the City's suggestion that the notice was inadequate because the letter was sent to the wrong department.  Second, the City argues that the language of the bond waives notice of transfer.  (City's Reply Br. 3-4)  The pertinent portion of the waiver provision provides: "[T]he Surety (Sureties), for value received, for itself and its successors and assigns, hereby stipulates and agrees that the obligation of said Surety (Sureties), and its bond shall be in no way impaired or affected by . . . any assignment, subletting or other transfer thereof or of any part thereof, or of

36

any Work to be performed, or any moneys due or to become due thereunder and said Surety

(Sureties) does hereby waive notice of any and all of such . . . assignments, subcontracts [sic]

transfers . . . ."  (Levy Decl. Ex. B 7)  While this provision might suggest that the surety Nobel

waived notice of transfer (although it likely does not), it does not support the City's argument

that summary judgment should be granted on the grounds that notice of Nobel's interest was

inadequate.  The fact that Nobel's obligations under the Bond are unaffected by any transfer or

assignment of the Contract does not entitle the City to then argue that notice was inadequate.

Given the absence of any argument in support of summary judgment on the grounds of

inadequate notice advanced in Nobel's brief, or, for that matter, cogently articulated at argument,

as well as the fact that there appears to be a number of issues of material fact regarding the

adequacy of the notice, the Court declines to grant the motion for summary judgment on this

ground.

### 3.  Statute of Limitations

Finally, the City argues that Nobel's claim is barred by the statute of limitations.

Specifically, the City maintains that under Article 53 of the Contract, incorporated by reference

in the Bond,[18] Nobel's action commenced beyond the six-month contractual limitations period

---

[18]  The Bond provides, in relevant part:

WHEREAS, the Principal is about to enter, or has entered, into a contract in
writing with the City for Dept. of Transportation Shore Boulevard Bulkhead
Rehabilitation from Quentin Street to Langham Street, Borough of Brooklyn, New
York, PIN No. 84195BK543KW (HWK692) a copy of which contract is annexed
to an [sic] hereby made a part of this bond as though herein set forth in full . . . .

(Levy Decl. Ex. B 5)

and therefore must be dismissed.[19]   Article 53 provides:

> . . . .
>
> No action shall lie or be maintained against the City by the Contractor upon any claims based upon this Agreement unless such action is commenced within six (6) months after the date of filing in the Office of the Comptroller of the City of the certificate for the final payment hereunder, or within six (6) months of termination or conclusion of this Agreement, or within six (6) months after the accrual of the Cause of Action, whichever first occurs.
>
> . . . .

(Levy Decl. Ex. I at AA 1a)[20]   The City argues that the "[t]his case has a very precise time at which accrual can be pinpointed: the City's March 3, 1998 final payment to Zollo, as alleged by plaintiff in its complaint." (City's Br. 18)[21]   Accordingly, the City maintains that the February 20,

---

[19] The City does not advance the argument, previously presented before Judge Berman on the motion to dismiss, that the action is time barred under Section 50-I of the General Municipal Law, which establishes a one year and ninety day statute of limitation for the commencement of an action in tort against a municipality.  (Berman Order 10)

[20] Pursuant to N.Y. C.P.L.R. section 201, "[a]n action, including one brought in the name or for the benefit of the state, must be commenced within the time specified in this article unless a different time is prescribed by law or a shorter time is prescribed by written agreement."  N.Y. C.P.L.R. § 201.

[21] Nobel does not dispute this proposition.  (Tr. at 18 ("THE COURT: All right.  And forgetting whatever the statute of limitations is, what is your position on exactly when the statute began to run in this case?  Moskow: I don't know whether it would start to run on the filing of the notice of claim or the commencement of the action.  I would assume the commencement of the action.  THE COURT: Well no, no, no.  That's when—that's determined whether or not you filed it within the time for — Moskow: I'm sorry, when it started to run.  THE COURT: Correct. Moskow: I would assume on March 3rd of 1998 when the City violated its stakeholder duty and distributed the funds that Nobel had asserted a right in.").

Judge Berman previously denied the motion to dismiss on the same statute of limitations grounds based on his view that "[t]he Court, on these facts, cannot determine if Nobel's action would be time barred because, among other things, the Court does not know if the 'condition' of a final payment voucher was satisfied."  (Berman Order 11)  Rather, "the factual issue of classifying the City's payment to Zollo as 'premature' (or final) also remains unresolved."  (*Id.*)

2000 filing of the Complaint falls outside the applicable statute of limitations period.

In enforcing contractual limitations agreements, "[t]he New York courts have recognized that . . . the shortened period must be reasonable and its terms will be strictly construed." *Raymond Int'l, Inc. v. City of New York*, 511 F. Supp. 773, 776 (S.D.N.Y. 1981). Courts have found a six month limitation clause, such as the one in this case, to be enforceable. *See id.* ("The New York courts have held . . . that the six month limitation clause utilized in New York City's contracts is enforceable."). Shortened periods, however, are to be "viewed with caution by the courts, and are construed strictly against the party invoking the shorter period." *Int'l Fid. Ins. Co.*, 98 F. Supp. 2d at 409. "A party to a contract does not surrender his right to resort to the Courts, with all of their safeguards, unless he has agreed, in writing, to do so, by clear language. Further, an agreement to do so will not be extended by construction or implication." *Nassau Chapter Civil Serv. Employees Ass'n, Local 830, AFSCME, Local 1000, AFL-CIO v. County of Nassau*, 585 N.Y.S.2d 966, 970 (Sup. Ct. 1992) (quotations omitted) [hereinafter "*Nassau Chapter*"], *aff'd*, 612 N.Y.S.2d 880 (App. Div. 1994).

In this case, Article 53 applies only to "action[s] . . . maintained against the City *by the Contractor* upon any claims based upon this Agreement." (emphasis added) Thus, the contractual limitations period applies only to those claims by the contractor Zollo against the City, and not an action such as this where the surety, Nobel, seeks recovery against the City under a theory of equitable subrogation. Though the City never directly responds to this argument, it could be argued that under the theory of equitable subrogation Nobel seeks to stand

---

Discovery has now closed and there appears to be no genuine issue of material fact that the final contract payment was vouchered on March 3, 1998. (Nobel's 56.1 Resp. ¶ 13)

in the shoes of the contractor, Zollo.   However, in this action, Nobel stands in the shoes of the subcontractors, based on its obligation on the *payment* bond.  *See Titan Indem. co. v. Triborough Bridge & Tunnel Auth., Inc.*, No. 94 Civ. 5447, 1996 WL 556988, at *4 n.2 (S.D.N.Y. Oct. 1, 1996) ("Under a payment bond, a surety becomes subrogated to the rights of the laborers and materialmen whose claims it paid.").  This is in contrast to Nobel's obligation on the *performance* bond, not at issue here, in which it would become "equitably subrogated to the same rights as the contractor has and to the unpaid balance of the contract price."  *Tri-City Elec.*, 468 N.Y.S.2d at 286.  Thus, strictly construing this provision only to claims brought by the contractor, or on its behalf, avoids "surrender [of Nobel's] right to resort to the Court, with all their safeguards," where Nobel  "has [not] agreed, in writing, to do so, by clear language." *Nassau Chapter*, 585 N.Y.S.2d at 970.

Accordingly, there is no basis to grant the City's motion for summary judgment on the statute of limitations grounds.

### E.  Covered Contracts: What Plaintiff Is Entitled To Recover

Finally, there is the question of what maximum damages the City could owe to Nobel. The City argues that even assuming *arguendo* that Nobel has a claim against the City, that claim is not the $492,229.77 sought in the Complaint, (Compl. ¶ 16), the total amount that the City allegedly paid Zollo "for work performed and materials supplied in prosecution of the Shore Boulevard Contract."  (Compl. ¶ 15) Specifically, the City contends that Nobel paid only $86,743.31 in connection with the Shore Boulevard Contract, but seeks an additional $572,965.67 for payments on another, unidentified contract.  (City's Br. 14 (citing Levy Decl. Ex. E 3-4 ("Interrog. Resp.")))  In response to the City's Interrogatory #7, asking Nobel to

40

"[i]dentify all laborers, subcontractors and suppliers who plaintiff claims, as alleged in the

Complaint, Zollo failed to pay in connection with the *Shore Boulevard Contract* and for each

subcontractor and supplier " (emphasis added), Nobel indicated that it made three payments of

$14,495.00, $62,248.31, and $10,000, for a total of $86,743.31.  (Interrog. Resp. ¶ 7)[22]  However,

Nobel further indicated that "[a] portion of the losses set forth in Nobel's Complaint include

claims by suppliers or laborers that Zollo failed to pay on another project [identified in Nobel's

papers as the 'Rail Control Center Project']" and outlines claims pertaining to that contract in the

sum of $572,965.67.  (Interrog. Resp. ¶ 7)

Nobel's argument that it is entitled to the larger sum connected to the Rail Control Center

Project is as follows.  Nobel points to an Agreement of Indemnity in favor of Nobel, executed on

or about November 30, 1995, in connection with another Zollo project.  (Nobel Br. 11)  Nobel

maintains that under the Agreement of Indemnity it was entitled to "[a]ll the rights of the

CONTRACTOR [Zollo] in, and arising in any manner out of any CONTRACT" (Nobel Br. 12

(quoting Agreement of Indemnity, Moskow Decl. Ex. A)), and, therefore, "[w]hen the City

violated its stakeholder duty by distributing the Shore Boulevard contract funds to Zollo, the City

impaired Nobel's rights under the Agreement of Indemnity" (Nobel Br. 13).

"There is . . . conflicting authority over the surety's equitable subrogation rights to

contract funds on other projects between the principal and obligee."  4 Phillip L. Bruner &

Patrick J. O'Connor, Jr., *Construction Law* § 12:101 (January 2005) (citing cases).  For example,

in *District of Columbia v. Aetna Ins. Co.*, 462 A.2d 428 (D.C. 1983), the court considered the

---

[22] Nobel further indicated that it "has either paid or otherwise settled all claims against
Nobel's bonds relative to the Shore Boulevard Contract."  (Interrog. Resp. ¶ 9)

question of whether a performing surety was entitled to recover monies which would otherwise have been owed by the same municipality to the contractor on a project unrelated to the default. The court concluded that such an award was appropriate, largely on the premise that because the right of subrogation is a "creature of equity," and "not founded on contract," the right is to be enforced solely to accomplish the "ends of justice." *Id.* at 431 (quoting *Memphis L.R.R. Co. v. Dow*, 120 U.S. at 301-02) (additional citations omitted).   Similarly, in *Transamerica Ins. Co. v. United States*, 989 F.2d 1188 (Fed. Cir. 1993), the Federal Circuit reversed the lower court's decision rejecting the surety's argument that it was entitled to set off its losses incurred in one project against funds owed to the contractor in another contract between the principal and the same obligee, in that case, the United States Army Corps of Engineers.  Relying in large party on *Aetna*, the court concluded that the equities strongly supported permitting such a setoff.  *Id.* at 1194.  Both *Aetna* and *Transamerica* were limited to those situations where there were no other competing interests involved, such that a party other than the surety might have priority over the surety's interest in the other contract, and both cases involved the same governmental entity as obligee in the contracts at issue.[23]

On the other side of the argument, there are several cases holding that a surety's subrogation rights are defined and limited by the underlying contract.  *See Intercargo Ins. Co. v.*

---

[23] *See also Dunn & Black, P.S. v. United States*, 366 F. Supp. 2d 1008, 1018 (E.D. Wash. 2005), ("[R]elying on *Transamerica Ins. Co. v. United States*, 989 F.2d 1188 (Fed.Cir 1993), intervenors argue that when a surety has bonded multiple projects with the same principal and obligee, the surety may use the default on one project to trigger its equitable subrogation rights to undisbursed construction funds on other bonded projects.  Because ERI owes intervenors $931,930.61 plus interest for all ERI bonded projects with the United States, the entire judgment amount of $450,000 should be awarded to intervenors under the law of equitable subrogation based on their dates of priority.").

*United States*, 41 Fed. Cl. 449, 457 (Fed. Cl. 1998) (noting that "the surety's right to subrogation arises only as to the monies due under the contract in question") (citing cases).  As the Fourth Circuit has put it, subrogation is premised on "the unpaid debts on each contract; relates back in time to the execution of that specific bond; and is limited in scope to the debts arising under one contract." *Western Cas. & Sur. Co. v. Brooks*, 362 F.2d 486, 491 (4th Cir. 1966).  According to this view, a surety "cannot improve its position as a payment bond surety on the [federal government's] contract by invoking its status as a performance bond surety on other federal contracts," even if that surety "enters into a number of construction bonds with the same contractor." *Dependable Ins. Co. v. United States*, 846 F.2d 65, 67 (Fed. Cir. 1988).

Interesting though this debate may be, the Court need not pick sides.  Simply put, Nobel is not entitled to recover funds on the Rail Control Center Project because the City is not the obligee of the Rail Control Center Project.  As noted, even the decisions finding a broad subrogation right to recover payments on unrelated contracts all involve a common obligee.  Here, however, as even Nobel acknowledges, the Rail Control Project was administered by the New York City Transit Authority.  (Nobel's 56.1 Statement ¶ 14)  Pursuant to N.Y. Public Authorities Law § 1201, the New York City Transit Authority is a public benefit corporation.  *See* N.Y. Pub. Auth. Law § 1201(a)(1) ("A board, to be known as 'New York City Transit Authority' is hereby created.  Such board shall be a body corporate and politic constituting a public benefit corporation.  It shall consist of seventeen members, all serving ex officio.  Those members shall be the persons who from time to time shall hold the offices of chairman and members of metropolitan transportation authority.").  As such, it is an entirely separate entity from the City of New York.  *See Bertone Commissioning v. City of New York*, 810 N.Y.S.2d 183,

43

183-85 (App. Div. 2006) (holding that it was proper to permit plaintiff to file late notice of claim against New York Transit Authority, which owned sidewalk gate that allegedly caused injury and which was a "separate entity" from the City of New York); *People v. Tomassetti*, 607 N.Y.S.2d 588, 589 (Sup. Ct. 1993) (noting that as a "public benefit corporation" the New York City Transit Authority is a not a political subdivision of New York State); *Calamari v. N. Y. City Trans. Auth.*, 603 N.Y.S.2d 710, 711 (Sup. Ct. 1993) (granting summary judgment to City of New York where a lease agreement gave Transit Authority control over subway stairway that allegedly caused injury to plaintiff). Moreover, section 1204 provides that the Transit Authority has the power "[t]o sue and be sued," N.Y. Pub. Auth. Law § 1204(1), and "[t]o make or enter into contracts, agreements, deeds . . . " N.Y. Pub. Auth. Law § 1204(11). Accordingly, the City is not the obligee with respect to the Rail Control Center Project. Thus, even if Nobel has equitable subrogation rights enforceable against the City for contracts unrelated to the Shore Boulevard Project, it cites no authority, and the Court is aware of none, that extends those rights to recover money from the City for a contract it did not enter into with Zollo. Therefore, Nobel may not recover money for the Rail Control Center Project in this action.

Nobel's attempt to expand the scope of its recovery fails for an additional reason. As outlined above, Nobel's theory of recovery is tied to the notification to the City that its interests were at stake. "Notice from the surety to the government [is] essential, for the government owes no duty to the surety unless the surety notifies the government of the contractor's default under the bond." *Ins. Co. of the West*, 243 F.3d at 1371 (Fed. Cir. 2001); *see also Aetna Ins. Co.*, 462 A.2d at 432 ("The letters from Aetna should, at a minimum, have placed the District on notice that there was a bona fide competing claim to the fund . . . . In the present situation, the District

44

had notice of both the facts giving rise to an equitable right in Aetna, and Aetna's claim under

these rights as manifested in the letters of August and October 1978. . . .   In reaching our

decision, we do not suggest that the District of Columbia must or should engage in an

interpleader action in each of its many construction projects.  Rather, we simply hold that in the

absence of other competing parties *where a surety gives a reasonable written notice of a claim*

*adverse to that of a defaulting contractor* for whom it has performed its bond, prudent use of the

interpleader process may assist the [government] in resolving the dispute . . . .") (emphasis

added).

Here, however, the Nobel's notification failed to alert the City to the fact that the Rail

Control Center Project was at issue.  Rather, the February 24, 1998 notification letter includes the

heading "Shore Blvd. Bulkhead Rehabilitation from Quentin St. to Langham St., Brooklyn, NY,"

and indicates that "Nobel Insurance Company is the payment and performance bond surety for

Zollo Construction Corp. with regard to the *above referenced construction project*."  (Levy Decl.

Ex. G) (emphasis added)  The letter further indicates that "Nobel is being exposed to potential

losses under its bonds furnished for *this* project," but fails to quantify such potential losses.  (*Id.*)

(emphasis added)  Nothing in this letter alerts the City to the fact that Zollo might seek to recover

losses sustained in connection with *other* projects.[24]

---

[24] Apart from this notice, from the commencement of this action it has not been clear that
Nobel is seeking to recover based on the Rail Control Center Project.  The Notice of Claim
provides: "That heretofore Nobel, as surety, issued, among others, performance and payment
bonds . . . in connection with a contract known as 'Department of Transportation, Shore
Boulevard, Bulkhead Rehabilitation, from Quentin Street to Langham Street, Borough of
Brooklyn, New York PIN No. 84195BK543RW (HWK692)," and that "[t]he nature of the claim
is for a payment in the amount of not less than $492,229.77 released by the City of New York to
Zollo after notification by Nobel, as surety, of claims for payment against its bonds by
subcontractors and suppliers of Zollo."  (Levy Decl. Ex. A)  Moreover, nothing in the Complaint

Nobel essentially claims that had the City interplead all of the money, there would have been sufficient funds available to satisfy its claims under both contracts.   Imposing such a duty on the City seems unreasonable, and, more importantly, has no sponsor in the law.[25]  Rather, the City was only on notice of the claims with respect to the Shore Boulevard Contract, and, accordingly, only became a stakeholder to the extent Nobel's interests were at stake with respect to that Contract.

Accordingly, the Court concludes that the most Nobel is entitled to recovery is the $86,743.31 in payments it made in connection with the Shore Boulevard Contract.

---

references the Rail Control Center Project—rather, the Complaint only speaks of the bonds issued in connection with the Shore Boulevard Contract.  (Compl. ¶¶ 6-7)

[25]

THE COURT: . . . But I am looking for case law that, in the context similar to this, that imposes that sort of duty of foreseeability on the City when there is absolutely nothing about the notice it got that alerts them to that possibility.

Moskow: Your Honor, other than saying that if the City had maintained the fund or interplead it, at which a hearing would have been conducted to determine who was entitled to what portions of those funds, there is no other argument other than that.

(Tr. 31-32)

### III.  Conclusion

For the foregoing reasons, the motion for summary judgment is DENIED, except that the

Court GRANTS the motion with respect to the City's argument that Nobel's recovery is limited

to $86,743.31.

SO ORDERED.

Dated:         September 29, 2006
               New York, New York


KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

47

SERVICE LIST

Robert S. Moskow II, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
&
Wall Street Plaza
88 Pine Street, 24th Floor
New York, NY 10005
*Counsel for Plaintiff*

Edwin Michael Levy
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007
*Counsel for Defendant*